## HANS *v.* STATE OF LOUISIANA.[1]

*(Circuit Court, E. D. Louisiana. May 15, 1885.)*

CONSTITUTIONAL LAW—ACT OF MARCH 3, 1875, (18 ST. 470)—SUIT AGAINST STATE.
The statute of 1875 makes the jurisdiction of the circuit courts, so far as it depends upon the nature of the questions involved, co-extensive with the judicial power created by the constitution, and therefore includes all suits in law or equity which involve a federal question. But there can be no suit unless there is a defendant capable to be sued. States, without their continuing assent, are incapable of being brought before courts or defendants.

2. SAME—CITIZEN SUING HIS OWN STATE.
The constitution, by implication, even before its eleventh amendment, did not include within the judicial power a suit by a citizen against his own state. This exemption was enjoyed by each state before that time, and is based upon the general sense and general practice of mankind

3. SAME—COMPELLING STATE TO PAY ITS OBLIGATIONS.
Good public reasons, founded on the distribution of powers in constitutional governments, make the power to compel states to pay their money obligations political and not judicial.

At Law. On exception to jurisdiction.

This suit was an action at law against the state of Louisiana by *a citizen of said state* for the recovery of the amount of certain coupons held by him representing the interest upon the "consolidated bonds" of said state, which fell due January 1, 1880. The bonds were authorized by an act of the legislature passed in 1874, which provided a continuing annual tax levy to meet the interest upon said bonds and a continuing annual appropriation thereof to its payment, and declared each provision of the act to be a contract between the state and every holder of the bonds issued under it. An amendment to the constitution of the state was adopted the same year, which is as follows:

"No. 1. The issue of consolidated bonds, authorized by the general assembly of the state, at its regular session in the year 1874, is hereby declared to create a valid contract between the state and each and every holder of said bonds, which the state shall by no means and in nowise impair. The said bonds shall be a valid obligation of the state in favor of any holder thereof, and no

[1] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.

court shall enjoin the payment of the principal or interest thereof, or the levy and collection of the tax therefor. To secure such levy, collection, and payment the judicial power shall be exercised when necessary. The tax required for the payment of the principal and interest of said bonds shall be assessed and collected each and every year until said bonds shall be paid, principal and interest, and the proceeds shall be paid by the treasurer of the state to the holders of said bonds as the principal and interest shall fall due, and no further legislation or appropriation shall be requisite for the said assessment and collection, and for such payment from the treasury."

By the new constitution adopted in 1879 it was ordained "that the coupon of said consolidated bonds falling due the first of January, 1880, be, and the same is hereby, remitted, and any interest taxes collected to meet said coupon are hereby transferred to defray the expenses of the state government." And by article 257 said constitution also prescribed that "the constitution of this state adopted in 1868, *and all amendments thereto, is declared to be superseded by this constitution.*" The plaintiff alleged that by said provisions of said constitution the state claimed to be relieved of the obligation of her contract to pay the coupons held by him, and refused such payment. He also alleged that said provisions of the constitution of 1879 impaired the validity of said contract, in violation of article 1 of section 10 of the constitution of the United States.

The state appeared and filed an exception to the jurisdiction of the court, *ratione personæ;* that the state could not be sued without her permission; that the constitution and laws do not give the court jurisdiction of a suit against the state; and she declined the jurisdiction.

*J. D. Rouse* and *Wm. Grant,* for plaintiff.

*M. J. Cunningham,* Atty. Gen., for the State.

ARGUMENT OF JOHN D. ROUSE, ESQ.

*May it please Your Honor:*

The attorney general having waived the opening of this discussion, I am compelled to anticipate his argument.

The action is brought by a citizen of the state of Louisiana against the state of Louisiana. The exception is to the jurisdiction of the court to entertain such an action, because the state of Louisiana is a sovereign and has not consented to be sued in this court, and declines to submit herself to its jurisdiction. The first question arising is, how far is the state of Louisiana sovereign? In some respects she possesses the elements of sovereignty; in many others she has been deprived of them with her consent, or, rather, as she is not one of the 13 original states, she has never enjoyed them. The original 13 colonies surrendered a portion of the sovereignty which they possessed as independent states when they entered into the Union under the constitution. * * * What sovereignty remained in the state of Louisiana when she became one of the United States under the constitution? She has no power to make treaties with foreign nations; she cannot issue letters of marque; she cannot enter into an alliance with a foreign state; she cannot pass any laws regulating or imposing duties upon imports; and there are various matters in which she does not possess the power of sovereign states. When the states entered into the Union, which some have seen fit to term a compact, and others properly denominate a nation, they surrendered to the nation which

they created, (or, properly speaking, which the people of the states created,) jurisdiction over those matters proper for the nation to have control of, rather than to be left to the individual constituents of that nation. By the adoption of the federal constitution they surrendered to the United States a certain degree of power to be exerted through its judiciary.

Section 2 of article 3 of the constitution of the United States provides "that the judicial power shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting embassadors, other public ministers, and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states; between citizens of the same state claiming lands under grants of different states; and between a state, or the citizens thereof, and foreign states, citizens, or subjects." Thus was the judicial power extended by the very letter of the constitution to controversies to which a state is a party. It was a necessity of the government which they formed that such a power should be vested, and especially was it a necessity that the power should be vested in cases which might arise under the constitution or laws of the United States.

In the case of *Osborne* v. *Bank*, 9 Wheat. 738, Chief Justice MARSHALL says that "this clause of the constitution enables the judicial department to receive jurisdiction to the fullest extent of the constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it." And again he says that "all governments which are not extremely defective in their organization must possess in themselves the power of expounding as well as enforcing their own laws."

So, also, Webster in his second speech on Foote's resolution said: "The people have wisely provided in the constitution itself a proper, suitable mode and tribunal for settling questions of constitutional law. These are in the constitution grants of power to congress, and restrictions on these powers. There are also prohibitions on the states. Some authority must, therefore, necessarily exist, having the ultimate jurisdiction to fix and ascertain the interpretation of these grants, restrictions, and prohibitions. The constitution has itself pointed out, ordained, and established that authority. How has it accomplished this great and essential end? By declaring, sir, that the constitution, and the laws of the United States made in pursuance thereof, shall be the supreme law of the land, anything in the constitution or laws of any state to the contrary notwithstanding. This, sir, was the first great step. By this the supremacy of the constitution and laws of the United States is declared. The people so will it. No state law is to be valid which comes in conflict with the constitution or any law of the United States passed in pursuance of it. But who shall decide this question of interference? To whom lies the last appeal? This, sir, the constitution itself decides also by declaring that the judicial power shall extend to all cases arising under the constitution and laws of the United States. These two provisions cover the whole ground. They are in truth the key-stone of the arch. With these it is a government; without them it is a confederation." 3 Webst. Works, 334. Again he said in his great argument before the senate of the United States, on the question whether the constitution was a compact between the sovereign states; "And in regard, sir, to the judiciary, the constitution is still more express and emphatic. It declares that the judicial power shall extend to all cases in law or equity arising under the constitution, laws of the United States, and treaties, that there shall be one supreme court, and that this supreme court shall have appellate jurisdiction of all these cases, subject to such exceptions as congress may make. It is impossible to escape from the generality of these

words. If a case arises under the constitution, that is, if a case arises depending on the construction of the constitution, the judicial power of the United States extends to it. It reaches the case, the question; it attaches the power of the national judicature to the case itself in whatever court it may arise or exist, and in this case the supreme court has appellate jurisdiction over all courts whatever. No language could provide with more effect and precision than is here done for subjecting constitutional questions to the ultimate decision of the supreme court. And, sir, this is exactly what the convention found it necessary to provide for, and intended to provide for."

In the case of *Mayor* v. *Cooper*, 6 Wall. 253, the supreme court say: "It is the right and duty of the national government to have its constitution and laws interpreted and applied by its own judicial tribunals. In cases arising under them, properly brought before them, this court is the final arbiter. The decisions of the courts of the United States, within their sphere of action, are as conclusive as the laws of congress made in pursuance of the constitution. This is essential to the peace of the nation, and to the vigor and efficiency of the government. A different principle would lead to the most mischievous consequences. The courts of the several states might determine the same questions in different ways. There would be no uniformity of decisions."

So, in the case of *Cohens* v. *Virginia*, 6 Wheat. 264, Chief Justice MARSHALL declares that "this jurisdiction is dependent upon the subject-matter, and where a case arises under the constitution and laws of the United States, the judicial power extends to it, whoever may be the parties."

Now, let us see, if your honor please, whether there is any reason for exempting a state from the operation of the judicial power of the United States, when a case presents a question arising under the constitution or laws of the United States. By entering into the nation, under the constitution of the United States, the several states submitted themselves in many named cases to its judicial power. A state may be sued by another state; and a state may sue, even now, a citizen of another state in the courts of the United States; and, before the constitution was amended, a state might be sued by the citizen of another state, or by an alien.

*Chisholm* v. *Georgia* was a suit brought by a citizen of South Carolina against the state of Georgia, under the provision of the constitution of the United States which declares that the judicial power of the United States shall extend to all controversies between states and the citizens of other states. It was there contended that that provision of the constitution authorized a state to sue a citizen of another state in the federal courts, but did not authorize a state to be sued. In deciding the case, Chief Justice JAY said: "The question now before us renders it necessary to pay particular attention to the second section, which extends the judicial power to 'controversies between a state and citizens of another state.' It is contended that this ought to be construed to reach none of these controversies excepting those in which a state may be plaintiff. The ordinary rules for construction will easily decide whether these words are to be understood in that limited sense. This extension of the power is remedial, because it is to settle controversies. It is, therefore, to be construed liberally. It is politic, wise, and good that not only the controversies in which a state is plaintiff, but also those in which a state is defendant, should be settled. Both cases, therefore, are within the reason of the remedy, and ought to be so adjudged, unless the obvious, plain, and literal sense of the words forbid it. If we attend to the words, we find them to be express, positive, free from ambiguity, and without room for such implied expressions. The judicial power of the United States shall extend to controversies between a state and citizens of another state. If the constitution really meant to extend these powers only to those controversies in which a state might be plaintiff, to the exclusion of those in which citizens had demands against a state, it is inconceivable that it should have attempted to

convey that meaning in words not only so incompetent, but also repugnant to it. If it meant to exclude a certain class of these controversies, why were they not expressly excepted? On the contrary, not even an intimation of such intention appears in any part of the constitution. It cannot be pretended that where citizens urge and insist upon demands against a state, which the state refuses to admit and comply with, that there is no controversy between them. Then it clearly falls, not only within the spirit, but the very words, of the constitution. What is it to the cause of justice, and how can it affect the definition of the word ' controversy,' whether the demands which cause the dispute are made by a state against citizens of another state, or by the latter against the former? When power is thus extended to a controversy, it necessarily, as to all judicial purposes, is also extended to those between whom it subsists. The exception contended for would contradict and do violence to the great and leading principles of a free and equal national government, one of the great objects of which is to insure justice to all,—to the few against the many, as well as to the many against the few. It would be strange indeed that the joint and equal sovereigns of this country should, in the very constitution by which they proposed to establish justice, so far deviate from the plain path of equality and impartiality as to give the collective citizens of one state a right of suing individual citizens of another state, and yet deny those citizens a right of suing them." 2 Dall. 476.

The result of that case led to the adoption of the eleventh amendment to the constitution. That amendment is but a limitation of the judicial power. It declares that the judicial power *shall not extend* to a suit brought by a citizen of another or a foreign state *against* a state of this Union, and divests no other jurisdiction under the constitution. The judicial power to entertain suits between a state and citizens of another state, provided the state is plaintiff, still remains; and that power has been exercised not unfrequently, notably in the case of *Pennsylvania* v. *Wheeling Bridge Co.* 18 How. 421. In that case it was contended that a state could not sue in the circuit court of the United States a citizen of another state, but it was held that the power to entertain jurisdiction of a controversy between a state and a citizen of another state was expressly granted in the constitution of the United States; that the eleventh amendment only took away jurisdiction of suits *against* a state when brought by a citizen of another state or of a foreign state, leaving the jurisdiction in all other cases unimpaired.

By entering the Union under the constitution the states submitted themselves to the judicial power of the United States in all cases contemplated by that constitution, and this proposition has been recently affirmed by the supreme court in the case of *New Hampshire* v. *Louisiana*, 108 U. S. 90; S. C. 2 Sup. Ct. Rep. 176. So, too, in the case of *Rhode Island* v. *Massachusetts*, 12 Pet. 720, the court say that "the states waived their exemption from judicial power as sovereigns by inherent right, by their own grant of its exercise over themselves."

It appearing, then, that the states are not sovereign; that they have consented in certain matters to submit their controversies to the jurisdiction of the courts of the United States,—is this suit one in which the state of Louisiana has submitted herself to the jurisdiction of the courts of the United States? The case presented, if your honor please, is that of a citizen of the state suing the state of Louisiana, alleging that he is the owner of certain coupons issued by the state of Louisiana, by which she contracted to pay him interest on certain obligations of the state, and he avers that the state of Louisiana has repudiated that contract; that she has forbidden her officers to execute it; that she has diverted the money which was collected for his payment to other uses. He avers that the action of the state of Louisiana impairs the contract which the state had made with him. The constitution of the United States declares

that no state shall impair the obligation of a contract. He therefore appeals to this court for a vindication of his constitutional right, and the enforcement of his constitutional guaranty that the contract entered into with him by the state shall not be impaired by herself. It presents a question arising under the constitution of the United States. It presents a question to which the judicial power of the Union extends under the third article of the constitution. * * * Is this case taken out of the category of cases in which states may be sued in the courts of the United States, because it is not included among those specially designated in which a state may be sued as a party? The attorney general concedes that the state could be sued by another state. He concedes that before the adoption of the eleventh amendment of the constitution a state could be sued by a citizen of another state, because the express language of the constitution authorized it, mentioning the states by name. But that does not exclude cases arising under the constitution or laws of the United States. The extension of jurisdiction in particular instances when a state is a party was deemed necessary because a case might arise between states and individuals which would not involve any question arising under the constitution or laws of the United States. But in all cases arising under the constitution and laws of the United States it was proper and right—it was a necessity—that the government of the United States should retain within itself the power, through its own courts, to determine the construction of that constitution, and to enforce its provisions.

The constitution, in article 3, § 1, declares that the judicial power shall be vested in one supreme court, and in such inferior courts as congress may, from time to time, ordain or establish. That is mandatory. It did not leave it to the discretion of congress. For a long time this power was vested in the supreme court alone, but by the act of March 3, 1875, congress extended that jurisdiction to the circuit courts (employing the very language of the constitution) in all cases arising under the constitution and laws of the United States, which are of a civil nature, when the amount of value in dispute exceeds $500.

In *Ames* v. *Kansas*, 111 U S. 449, S. C. 4 Sup. Ct. Rep. 437, the state brought a suit against a corporation of her own creation, in one of her own courts. The defendant having set up its acceptance of the provisions of an act of congress by which it became a part of the Union Pacific Railway, incorporated by an act of congress, sought and obtained a removal of the cause to the circuit court, on the ground that the case presented a controversy arising under a law of the United States. The state denied the jurisdiction of the circuit court, because the state was a party, and declined to assent thereto, and moved to remand the cause to the state court whence removed. The motion was refused, and the supreme court affirmed the circuit court in maintaining jurisdiction. The court reviewed all previous decisions upon the subject of jurisdiction in cases where a state was a party, and, applying the principles of such decisions to the act of March 3, 1875, the court held that, as to cases arising under the constitution or laws of the United States, the language of the act of 1875 "is identical with that of the constitution, and the evident purpose of congress was to make the original jurisdiction of the circuit courts co-extensive with the judicial power in all cases where the supreme court had not already been invested by law with exclusive cognizance. * * * The judicial power of the United States extends to *all* cases arising under the constitution and laws, and the act of 1875 commits that power to the circuit courts."

The same question as to the extent of the judicial power, and whether it includes cases to which a state is a party, when the case arises under the constitution or laws of the United States, was fully considered by the supreme court as long ago as 1821, in *Cohens* v. *Virginia*. Chief Justice MARSHALL then said: "It may be true that the partiality of the state tribunals, in ordi-

nary controversies between a state and its citizens, was not apprehended, and therefore the judicial power of the Union was not extended to such cases; but this was not the sole nor the greatest object for which this department was created. A more important, a much more interesting, object was the preservation of the constitution and laws of the United States, so far as they can be preserved by judicial authority; and therefore the jurisdiction of the courts of the Union was expressly extended to all cases arising under the constitution and those laws. If the constitution or laws may be violated by proceedings instituted by a state against its own citizens, and if that violation may be such as essentially to affect the constitution and the laws, such as to arrest the progress of government in its constitutional course, why should their cases be excepted from that provision which expressly extends the judicial power of the Union to all cases arising under the constitution and laws. After bestowing on this subject the most attentive consideration, the court can perceive no reason, founded on the character of the parties, for introducing an exception which the constitution has not made, and we think the judicial power, as originally given, extends to all cases arising under the constitution or a law of the United States, whoever may be the parties."

In deciding *Ames* v. *Kansas*, the chief justice quoted and reaffirmed this case. No amount of argument on my part could add anything to what was there said by Chief Justice MARSHALL. Under the provisions of the constitution which extends the judicial power to all cases arising under the constitution and laws of the United States, the plaintiff has brought his case, and the jurisdiction of this court is demonstrated, and the state has no such sovereignty as will exclude this court from taking jurisdiction. When she became a member of the Union, she became a member subject to the judicial power of the United States, in the cases provided for in the constitution. *Dodge* v. *Woolsey*, 18 How. 351 *et seq.; Cohen* v. *Virginia*, 6 Wheat. 378; *Ames* v. *Kansas*, 111 U. S. 449; S. C. 4 Sup. Ct. Rep. 437; *Harvey* v. *Com.* 20 FED. REP. 411, and note, 417. But, if the court please, we need not rest our case upon the consent contained in the constitution itself. The state of Louisiana has herself most emphatically submitted herself to the judicial power for the enforcement of the very contract which the plaintiff here seeks to enforce. The consolidated bonds to which the coupons are annexed, upon which the plaintiff sues, were issued under act No. 3 of the legislature of 1874. Section 11 of that act provides "that each provision of this act shall be, and is hereby declared to be, a *contract* between the state of Louisiana and each and every holder of the bonds issued under this act." At the same time, an amendment to the constitution of the state of Louisiana was proposed, which was subsequently adopted, and which provides as follows: "The issue of consolidated bonds, authorized by the general assembly of the state, at its regular session in the year 1874, is hereby declared to create a valid contract between the state and each and every holder of said bonds, which the state shall by no means and in nowise impair. The said bonds shall be a valid obligation of the state in favor of any holder thereof, and no court shall enjoin the payment of the principal or interest thereof, or the levy and collection of the tax therefor. To secure such levy, collection, and *payment,* the *judicial power* shall be exercised when necessary."

Your honor will perceive that, by the language of the amendment, the extension of the judicial power is to enforce the payment of the principal and interest; not simply the payment of the tax, but the payment of the obligation itself. The language employed is, "and to secure such levy, collection, and *payment."* The words "levy and collection" apply to the tax, and the word "payment" applies to the principal and interest of the obligation — of the bonds themselves.

Now, what is the judicial power? It has been defined by some high authorities to be the power of the judges—the power of the courts. I say that

it is the power of the judges to hear and determine—to decide—controversies between individuals. It includes also the power to enforce the mandates or decrees of the courts. Now, to what judicial power has the state of Louisiana submitted herself by this amendment to the constitution? Palpably and plainly, first to her own judicial power—to the power of her own courts. The words "judicial power" evidently refer to her own courts; but it includes more than her own courts. It submits the state of Louisiana to the judicial power of all courts capable of taking jurisdiction *ratione materia.* A party may go into the federal court to enforce any right which he may enforce in a state court. When a state submits itself without reservation to the jurisdiction of the court in a particular case, that jurisdiction may be used in the particular case to enforce what the state has given permission to be done. That is what the supreme court said in the case of *Louisiana* v. *Jumel,* 107 U. S. 728, S. C. 2 Sup. Ct. Rep. 128, in construing this very constitutional amendment. And there is instruction in what was said by Mr. Justice FIELD in his dissenting opinion on that subject. "I admit," said he, "that the rule of the common law that the sovereign cannot be held amenable to process in his own courts without his consent, is applied in this country to the state, under which designation are included the people within its territorial limits, in whom resides whatever sovereignty the state possesses. But they act and speak in this country, at least in time of peace, only through the constitution and laws. For their will we must look to these manifestations of it. If in that way they consent to suits, either directly against themselves by name, or against any of their authorized agents, there can be no reason of policy or of law against issuing process in proper cases to bring them or their agents before the court." Again he says, at page 731: "It would puzzle the wit of man to find anywhere in the legislation of the world a more perfect assurance of the fixed purpose of a state to keep faith with her creditors, or of a pledge of a portion of her revenues for their payment, or of the submission of her officers to the compulsory process of the judicial tribunals, if necessary to carry out her engagements."

In the case of *Curran* v. *Arkansas,* 15 How. 304, it was objected that the state could not be sued. But the supreme court answered that "the objection involved a question of local law, and that as the state permitted herself to be sued in her own tribunals, that was conclusive upon the subject." And in *Davis* v. *Gray,* 16 Wall. 221, the doctrine was reaffirmed, and after affirming it the court said: "A party, by going into a national court, does not lose any right or appropriate remedy of which he might have availed himself in the state courts of the same locality. The wise policy of the constitution gives him a choice of tribunals. In the former, he may hope to escape the local influences which sometimes disturb the even flow of justice. And in the regular course of procedure, if the amount involved be large enough, he may have access to this tribunal as the final arbiter of his rights."

So, if your honor please, by the submission of herself to the judicial power of her own courts, the state submitted herself to the judicial power of the federal courts having jurisdiction *ratione materia.* She submitted herself to the jurisdiction of this court, because she made no exception. Even the supreme court of Louisiana, in the case of *State* v. *Burke,* put her exemption from suit to enforce this contract upon the ground that the constitutional amendment of 1874, which submitted the state of Louisiana to the judicial power, had been repealed by the constitution of 1871, and that submission taken away. Commenting upon this very opinion of the supreme court of Louisiana, Mr. Justice FIELD says. "In thus holding, the court would seem to have lost sight of two provisions of the federal constitution, one of which declares that 'the constitution, and the laws of the United States which shall be made in pursuance thereof, * * * shall be the supreme law of the land;' and the other, which declares that 'the judges in every

state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.' These provisions, which govern in Louisiana as well as in other states, being overlooked, and the inhibition against the impairment of the obligation of contracts being limited to legislative action only, on the part of the state, so far as concerns her own contracts, it is not surprising that the court held that the ordinance of repudiation and shame embodied in the new constitution was to be obeyed; that its conflict with the federal constitution was to be disregarded; and that what the state was prohibited from doing should be deemed the legal expression of her will, and enforced as such. The decision rests upon the theory that a proceeding against the officers of the state to compel them to do their duty is a suit against the state, and that her consent to a suit against them has been withdrawn by clauses of the new constitution. But if those clauses never lawfully became a part of the new constitution, because the state under the federal constitution was incapable of enacting them, then her consent remains, and the present suits are simply attempts to compel her officers to do her lawful bidding. The state cannot speak through an enactment which contravenes the federal constitution." 107 U. S. 741; S. C. 2 Sup. Ct. Rep. 153.

The supreme court of Louisiana assumed that, although the constitution of the United States prohibited the state from passing any law impairing the validity of a contract, the state, by the adoption of a constitution, could avoid that prohibiton. The court, in coming to that conclusion, overlooked the numerous decisions of the supreme court of the United States, declaring that that provision of the constitution was directed as well against impairing the obligation of a contract by constitutional amendment as by legislative authority; that in the meaning of the prohibition a constitution is a law.

In the case of *Dodge* v. *Woolsey*, 18 How. 331, it was held that "a change of constitution cannot release a state from contracts made under a constitution which permits them to be made." And in *Railroad Co.* v. *McClure*, 10 Wall. 511, that "the constitution of a state is undoubtedly a law," within the contract clause of the constitution, and that "a state can no more do what is thus forbidden by one than by the other;" and in *White* v. *Hart*, 13 Wall. 646, and *Gunn* v. *Barry*, 15 Wall. 610, the supreme court repeated these declarations with emphasis, and reaffirmed them. * * *

In *Louisiana* v. *Jumel*, Mr. Justice FIELD says: "When a state enters into the markets of the world as a borrower, she, for a time, lays aside her sovereignty and becomes responsible as a civil corporation." 107 U. S. 740; S. C. 2 Sup. Ct. Rep. 151. He but reiterated the language of the supreme court in *Murray* v. *Charleston*, where they say: "The truth is, states and cities, when they borrow money and contract to pay it with interest, are not acting as sovereigns. They come down to the level of ordinary individuals. Their contracts have the same meaning as that of similar contracts between private persons. Hence, instead of there being in the undertaking of a state or city to pay, a reservation of a sovereign right to withhold payments, the contract should be regarded as an assurance that such a right will not be exercised. *A promise to pay, with a reserved right to deny or change the effect of a promise, is an absurdity.*" 96 U. S. 445. * * * I presume it will not be disputed that the obligation here sued upon is a contract. If it be, I refer the attorney general to the opinion of the chief justice in the case of *Louisiana* v. *Jumel*, where he says: "The language employed in this instance shows unmistakably a design to make these promises and these pledges so far contracts that their obligations would be protected by the constitution of the United States against impairment." 107 U. S. 719; S. C. 2 Sup. Ct. Rep. 135.

I presume that the gentleman will not attempt to deny that the debt ordinance does impair that contract. In addition to the debt ordinance, we have article 257 of the constitution of 1879, which prescribes that "the constitution of this state, adopted in 1868, *and all the amendments thereto*, is

declared to be superseded by this constitution." That is an impairment of the contract by which the state had submitted herself to the judicial power for the enforcement of the contracts made under act No. 3 of the session of 1874.

But it is said that this case has been decided in that of *Louisiana* v. *Jumel.* I deny it. I deny that there is anything in that case which prevents the plaintiff from bringing and maintaining this suit. That case was not an action upon any contract under the act of 1874, seeking to enforce its obligations, but a case seeking the general good. In the one case, the plaintiffs asked for an injunction against an officer of the state from obeying the mandates of the constitution of 1879 in violation of the amendment of 1874; in the other case, they asked that the officers of the state be compelled to execute the contract of 1874, not in their own behalf, but in behalf of everybody who was interested in it. They were philanthropists seeking the general good. They asked the court to sit for the purpose of enforcing an obligation in favor of the whole world, and not for any special relief for themselves. Before the case went to trial they abandoned their claim for individual relief, and struck their demand therefor out of the pleadings. They in effect asked the court to take charge of the finances of the state, and to administer them for the' benefit of all who were interested in the execution of the contracts into which the state had entered.

What did the court say: "The bonds and coupons which the parties to these suits hold, have not been reduced to judgment, and there is no way in which the state, in its capacity as an organized political community, can be brought before any court of the state or of the United States to answer a suit in the name of *these holders* to obtain such a judgment." Then it proceeds to give the reason why *these holders* could not bring a suit against the state: "It was expressly decided by the supreme court of the state in *State* v. *Burke,* 33 La. Ann. 498, that such a suit could not be brought in the state court, and under the eleventh amendment to the constitution no state can be sued in the courts of the United States by a *citizen of another state.*" (Those plaintiffs were citizens of the state of New York.) "Neither was there when the bonds were issued, nor is there now, any statute or judicial decision giving the bondholders a remedy in the state courts, or elsewhere, either by *mandamus or injunction,* against the state in its political capacity, to compel it to do what it has agreed should be done, but which it refuses to do." 107 U. S. 720; S. C. 2 Sup. Ct. Rep. 135.

Does it exclude all remedy? Does it prevent the plaintiff from appealing to the judicial power to enforce the contract which the state had made with him? Does it prevent a *citizen of the state* from bringing a suit arising under the constitution and laws of the United States, when he seeks to enforce the prohibition against the impairment of his contract? There is not a word in this decision which excludes the remedy sought in this case, or the jurisdiction we are now seeking to maintain. The court said: "The question then is whether the contract can be enforced, notwithstanding the constitution, by coercing the agents and officers of the state whose authority has been withdrawn in violation of the contract, *without the state itself, in its political capacity, being a party to its proceedings.*" 107 U. S. 721; S. C. 2 Sup. Ct. Rep. 136.

Your honor will perceive that one of the objections to the jurisdiction of the court was that the state was not a party to the proceedings. We have avoided that objection in this case by suing the state instead of her officers. Again, said the court: "So that the remedy sought implies power in the judiciary to compel the state to abide by and perform its contracts for the payment of money, not in rendering and enforcing a judgment in the ordinary form of judicial procedure, but by assuming the control of the administration of the fiscal affairs of the state to the extent that may be necessary to accom-

plish the end in view." 107 U. S. 722; S. C. 2 Sup. Ct. Rep. 136. That is what the court said in the case of *Louisiana* v. *Jumel.* Does your honor wonder that they came to that conclusion? Would it be possible for the court to come to any other conclusion, in view of the form of the pleadings and the mode of proceeding adopted by the complainants?

I respectfully submit, then, that the state has consented to be sued. I submit that she has made that consent a matter of contract, upon which she has obtained the loan of money. I submit that she cannot withdraw that consent to the injury of the party with whom she contracted; that such withdrawal impairs the validity of the contract, and is prohibited by the constitution of the United States, which is as binding upon the state, acting in a constitutional capacity, as it is upon the legislature of the state. The theory that the state is a sovereign finds no place in our government. I have already demonstrated that she is not a sovereign, although she possesses some elements of sovereignty. But it is immaterial whether she be a sovereign or not. It is immaterial whether the Union is a compact or a national government. It was established, as recited in the preamble, by the people of the United States, for the purpose, among other things, of establishing justice. And for the purpose of establishing justice they provided that the states should be subject to the judicial power, realizing that it was as necessary to administer justice between a state and her citizens as it is between citizens of different states. Therefore, I contend that I have established the two propositions: *First,* the submission of the state to the judicial power of the United States, by her entering into the Union; and, *secondly,* her submission thereto by her own voluntary act in the amendment of 1874 to her constitution.

Such submission to the judicial power of the Union being established, the jurisdiction of this court must be maintained.

BILLINGS. J. In *Louisiana* v. *Jumel* and *Elliott* v. *Wiltz,* reported in 107 U. S. 711, S. C. 2 Sup. Ct. Rep. 128, it was held by this court, and subsequently declared by the supreme court, that the suit was, in substance and effect, a suit against a state, and therefore that this court had no jurisdiction to hear or determine the same. This suit is brought upon obligations similar in all respects to those involved in the *Elliott Case, i. e.,* issued under the same legislative and constitutional guaranties, and impeded and defied by the same constitutional ordinance. There the plaintiff was a citizen of the state of New York. Here the plaintiff is a citizen of the state of Louisiana. The greater includes the less. If a citizen of another state cannot sue, *a fortiori* a citizen of Louisiana cannot. The effect of the eleventh amendment of the constitution was a construction by amendment of section 2, art. 3, of the constitution; and so far as, under that section, it had been held that the judicial power included a suit between a state and citizens of another state, when the state was defendant, that construction had been reversed. So far as relates to the class of cases to which this case belongs, viz., where a state is sued by its own citizens, the constitution had never included it, but had by implication excluded it.

The general clause, that "the judicial power shall extend to all cases in law and equity arising under the constitution of the United States," establishes the rule of boundary of jurisdiction so far as it depends upon the subject-matter of the suit, but was not meant to change or

affect the capacity or liability of parties to be sued. It therefore included all suits involving or arising under the federal constitution, brought by parties competent to sue against parties capable of being sued. It included all suits of a requisite character against parties so situated or constituted that they could be sued, whether brought by individuals or by the United States or one of the states or by a foreign government; but it had no effect to subject to the jurisdiction of the courts parties incapable to be sued.

Indeed, it is to be observed that in the enumeration of the cases to which the judicial power extends, (Const. art. 3, § 2,) while there is specified the cases "between a state and citizens of another state, and between a state and the citizens thereof and foreign states, citizens or subjects," there is no mention of cases between a state and its own citizens. It is undoubtedly true that this enumeration of parties who could sue merely by virtue of their own character would not at all prevent the inclusion within the judicial power of other cases on account of the nature of the controversy. But when the jurisdiction is given merely by the character of the questions involved, it must be a suit in law or equity; that is, a demand presented against a party defendant, who, according to its nature and relations to others, can be sued. According to the settled ideas relating to governments, a state can no more be sued contrary to its continuing assent than can the dead. No matter what the nature of the controversy against the dead, human tribunals can take no cognizance of it. No more can they against a state against its will. The reason is that weightiest public reasons prevent that control over the treasury and resources of a state, and the compulsory appropriation thereof to the extinction of its debts on the part of courts, which the recovery of a judgment implies and necessitates. When the constitution was adopted, the effective enforcement of money judgments, obtained in equity, was by sequestration, and in law by the imprisonment of the debtor, which, of course, would be inapplicable to indebted states. Not more inconsistent with the functions of states, and, indeed, with their very existence, or organisms for the protection of the lives and property and health of the citizens, and their advancement by education, is any judicial control over the property of the states by bringing them directly before the courts. Though they do not make war or peace, nor regulate foreign or domestic commerce, nor deal with foreign governments, nor with each other through treaties, they still must, as sovereigns, regulate the taxation of the citizens, and must apply the taxes, when levied, to the repelling of pestilence, to the maintenance of schools and public order, and the promotion of the rights of all its citizens in their persons and estates. Its taxes must be levied, and its public lands disposed of, by legislative will, for which a *mandamus* from the courts, or a marshal's sale, cannot be substituted. The payment of the debts of a state is left to be enforced by an enlightened public conscience, which, at the time the constitution was adopted,

was thought to be an ample power to prevent all repudiation. It is matter of regret that just creditors of a state should be disregarded or defied; but even that is better than that government should be crippled and public good be possibly defeated, or public necessities go unprovided for.

These are the reasons which were given by the publicists and jurists against a state being sued against its will,—its continuing will, —when the constitution was submitted for adoption. These were the reasons given by Alexander Hamilton in the Federalist, No. 81, (Washington Ed. of 1818,) p. 508, when he says:

"It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the Union. * * * There is no color to pretend that the state governments would, by the adoption of the plan of the convention, be divested of the privilege of paying their debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretension to a compulsive force. They confer no right of action independent of the sovereign will. *To what purpose would it be to authorize suits against states for the debts they owe? How could recoveries be enforced? It is evident it could not be done without waging war against the contracting state;* and to ascribe to the federal courts by mere implication, and in destruction of a pre-existing right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable."

See, also, Mr. Madison, as reported in 2 Elliot's Debates, 390. He there says: "It is not in the power of individuals to call any state into court." Mr. Webster, in his letter to Baring Bros. & Co., vol. 6, (Everett's Ed.,) at page 539, says:

"The security for state loans is the plighted faith of the state as a political community. It rests on the same basis as other contracts with established governments,—the same basis, for example, as loans made by the United States under the authority of congress; that is to say, the good faith of the government making the loan, and its ability to fulfill its engagements. It has been said that the states cannot be sued on these bonds. But neither could the United States be sued, nor, as I suppose, the crown of England. Nor would the power of suing give to the creditors, probably, any substantial additional security. The solemn obligation of a government arising on its own acknowledged bond would not be enhanced by a judgment rendered on such bond. If it either could not or would not make provision for paying the bond, it is probable that it could not or would not make provision for satisfying the judgment."

When the legislature of Massachusetts protested against the decision in *Chisholm v. Georgia,* 2 Dall. 419, it was against a state being sued by any one. This was the utterance of the conventions of New York and Rhode Island when they voted for the adoption of the constitution. This was the meaning of the eleventh amendment. It introduced no new provision, but corrected what the people of three-fifths of the states thought was an erroneous construction. The reasons which prompted it, and the arguments which secured it, are equally

strong against the citizen suing his own state, and against his suing any other state. In both cases the exemption springs from the inability of a court to deal directly with the treasury of a state.

In the cases of *Cohens* v. *Virginia*, 6 Wheat. 319, and of *Ames* v. *Kansas*, 111 U. S. 470, S. C. 4 Sup. Ct. Rep. 437, the court held that when a state instituted a suit it necessarily submitted itself to all reviews in and transfers to the federal courts, which the constitution and laws establishing the court authorized,—*i. e.*, that having voluntarily taken the position of suitor, the state had necessitated the enforcement of all legally established rules by which the rights of parties litigant were ascertained and adjudged; and these cases hold nothing more. The contest there was as to what followed in the progress of a cause where the character of a suitor had been voluntarily assumed by a state to enforce a demand or a proceeding. The contest here is altogether different, and is whether a state can compulsorily be made a suitor. In both these cases the learned chief justices expressly reserve the question as to the right to present a demand against a state, even in a cause instituted by a state. They say, Chief Justice MARSHALL speaking originally, and Chief Justice WAITE speaking by quotation:

"The argument would have great force to prove that this court could not establish the demand of a citizen upon his state, but is not entitled to the same force when urged to show that this court cannot inquire whether the constitution and laws of the United States protect a citizen from a prosecution instituted against him by a state."

After an attentive consideration of the able arguments made and authorities cited by the counsel, my conclusion is that while the act of 1875, so far as jurisdiction depends upon the nature of the litigation, makes the jurisdiction of the circuit court co-extensive with the judicial power created by the constitution, and therefore includes all suits in law or equity involving a federal question, nevertheless, that does not include a suit against a state, for the reason that it is incapable to be sued against its continuing assent; and where, as here, the object of the suit is the recovery of money, courts would be without any means of enforcing the judgment without an assumption of those powers which, in accordance with the checks and balances and distribution of powers in all well-constituted governments, are unchangeably and forever political, and not judicial.

The exception must be maintained, and the suit dismissed.

See note to *Baltimore & O. R. Co.* v. *Allen*, 17 FED. REP. 188–197.—[ED.