## WILLIAMS v. UNITED STATES.

No. 728.   Argued April 12, 1933.—Decided May 29, 1933.

554

Mr. *George A. King,* with whom *Messrs. George R. Shields* and *Herman J. Galloway* were on the brief, for plaintiff.

558

*Solicitor General Thacher,* with whom *Messrs. Wm. W. Scott, Robert P. Reeder, Erwin N. Griswold,* and *H. Brian Holland* were on the brief, for the United States. A summary of the Government's position is given in the report of the case next preceding.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

Plaintiff is, and since November 11, 1929, has been, a judge of the Court of Claims of the United States. Since his entry upon the duties of his office, and until June 30, 1932, he received a salary at the rate of $12,500 per annum, as fixed by the Act of December 13, 1926, c. 6, § 1, 44 Stat. 919. Since that date he has been paid at the rate of $10,000 per annum under a ruling of the Comptroller General of the United States. Compare *O'Donoghue* v. *United States,* decided this day, *ante,* p. 516.

The Legislative Appropriation Act of June 30, 1932 (c. 314, 47 Stat. 382, 402) in part provides:

"Sec. 107. (a) During the fiscal year ending June 30, 1933—

. . . . .

"(5) the salaries and retired pay of all judges (except judges whose compensation may not, under the Constitution, be diminished during their continuance in office); if such salaries or retired pay are at a rate exceeding $10,000 per annum, shall be at the rate of $10,000 per annum."

The Comptroller General, as the basis for his ruling, took the view that the Court of Claims is a "legislative" court, and not a "constitutional" court created under Art. III, § 1, of the Constitution, which provides:

"The judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the Supreme and inferior Courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office."

On February 8, 1933, this suit was brought in the Court of Claims to recover the amount of the difference between the statutory rate of $12,500, and the smaller amount paid under the ruling of the Comptroller General. The suit was brought by plaintiff in the court of which he is a member, because, as it is averred, no other court or remedy was open to him. Plaintiff's petition rests upon the contention that the Court of Claims is a constitutional court, created in virtue of the power of Congress to constitute tribunals inferior to the Supreme Court, whose judges "shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished

during their continuance in office." The government demurred to the petition, upon the ground that the judges of the Court of Claims are not judges of an "inferior court" within the meaning of that constitutional provision. The Court of Claims, without passing upon the demurrer, certified to this court the following questions, upon which it desires instructions, under § 3 (a) of the Act of February 13, 1925, c. 229, 43 Stat. 936, 939:

"I. Does Section 1, Article III, of the Constitution of the United States apply to the Court of Claims and forbid a reduction of the compensation of the Judges thereof during their continuance in office?

"II. Does the provision of Section 2, Article III, of the Constitution, wherein it is stated that 'The Judicial Power shall extend . . . to controversies to which the United States shall be a party,' apply to the Court of Claims, and does this provision authorize the creation and establishment of that Court?

"III. Can the compensation of a Judge of the Court of Claims be lawfully diminished during his continuance in office?"

In the O'Donoghue case, supra, we have discussed in some detail the purposes which led the framers of the Constitution to incorporate in that instrument the provisions in respect of the permanent tenure of office and the undiminishable character of the compensation of the judges; and have pointed out that the judges of the Supreme Court and Court of Appeals of the District of Columbia plainly come within the spirit and reason of the compensation provision, and must be held to fall within its intent, unless that conclusion is precluded by other considerations. Much of what is there said may also be said in respect of the Court of Claims. It is a court of great importance, dealing with claims against the United States, which, in the aggregate, amount to a vast sum every year. The questions which it considers call for

the exercise of a high order of intelligence, learning and ability. The preservation of its independence is a matter of public concern. The sole function of the court being to decide between the government and private suitors, a condition, on the part of the judges, of entire dependence upon the legislative pleasure for the tenure of their offices and for a continuance of adequate compensation during their service in office, to say the least, is not desirable.

But these considerations, though obvious enough, are not sufficient, standing alone, to support a conclusion that the Court of Claims comes within the reach of the judicial article in respect of tenure of office and compensation. The integrity of such a conclusion must rest not upon its desirability, but upon its conformity with the provisions of the Constitution.

For reasons which are set out in the *O'Donoghue* opinion, the courts of the territories are legislative courts, while the superior courts of the District of Columbia are constitutional courts. The Court of Claims differs so essentially from both, that its status, in respect of the question under consideration, must be determined from an entirely different point of view.

That court was first established by the Act of February 24, 1855, c. 122, 10 Stat. 612, entitled, "An Act to establish a Court for the Investigation of Claims against the United States." It was to consist of three judges, to hold their offices during good behavior. The act provided that the court should hear and determine certain claims against the government of the United States, and also all claims which might be referred to the court by either House of Congress. The court was to keep a record of its proceedings in each case and make a report to Congress for the action of that body. By the Act of March 3, 1863, c. 92, 12 Stat. 765, the court was for the first time authorized to render final judgments, from which an appeal was allowed in certain cases. Section 14 of that act provided:

" That no money shall be paid out of the treasury for any claim passed upon by the court of claims till after an appropriation therefor shall be estimated for by the Secretary of the Treasury."

Because of that provision, it was held in *Gordon* v. *United States,* 2 Wall. 561, that under the Constitution no appellate jurisdiction could be exercised by this court. The reasons for that conclusion are stated in an undelivered opinion written by Chief Justice Taney and, with approval, published for the first time in 117 U. S. 698. It was there stated that in view of § 14 the power of the Court of Claims and of this court was merely to certify their opinion to the Secretary of the Treasury; and whether the claim was paid in accordance with the opinion depended not on the decision of either court, but upon the future action of the Secretary and of Congress. So far as the Court of Claims is concerned, it was said, there is no objection to these provisions, since Congress undoubtedly may establish tribunals to examine testimony and decide in the first instance upon the validity and justice of any claim against the United States, subject to the supervision and control of Congress or the head of an executive department. Such authority was likened to that of an auditor or comptroller, and the circumstance that the tribunal was called a court and its decisions called judgments could not alter its character or enlarge its power. But in respect of this court different principles were said to apply, since this court is created by the Constitution and represents one of the three great divisions of power in the government, " to each of which the Constitution has assigned its appropriate duties and powers, and made each independent of the other in performing its appropriate functions. The power conferred on this court is exclusively judicial, and it cannot be required or authorized to exercise any other." The conclusion, therefore, was that Congress could neither .

confer nor impose on this court the authority or duty of hearing or determining an appeal from such a tribunal, nor authorize or require this court to express an opinion on a case where its judicial power could not be exercised and where its judgment would not be final and conclusive upon the rights of the parties.

These observations, without adverting to others which have been disavowed, have since met with the uniform approval of this court.

The decision of the *Gordon* case in the 2d of Wallace was announced on March 10, 1865. At the next session of Congress § 14 was repealed. Ch. 19, 14 Stat. 9. Since that time it never has been doubted that Congress may authorize an appeal to this court from a final judgment or decree of the Court of Claims, *United States* v. *Jones*, 119 U.S. 477, 478–479; *In re Sanborn*, 148 U.S. 222, 225; *Luckenbach S.S. Co.* v. *United States*, 272 U.S. 533, 536 *et seq.*, or that the judgment of this court rendered on such appeal constitutes a final determination of the matter. *United States* v. *O'Grady*, 22 Wall. 641, 647. It is equally certain that the judgments of the Court of Claims, where no appeal is taken, under existing laws are absolutely final and conclusive of the rights of the parties unless a new trial be granted by that court as provided by law. *Id.* Indeed, as appears from the cases already cited and others, such finality and conclusiveness must be assumed as a necessary prerequisite to the exercise of appellate jurisdiction by this court.

In 1887 Congress gathered together the preceding acts in respect of suits against the government in what is called the Tucker Act. Ch. 359, 24 Stat. 505. By that act the Court of Claims was given jurisdiction to hear and determine, among other matters, all claims upon any contract, express or implied, with the government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, " in respect of which claims

the party would be entitled to redress against the United States either in a court of law, equity, or admiralty if the United States were suable." By § 2 of the act, as amended and supplemented by § 24 (20) of the Judicial Code, concurrent jurisdiction was conferred upon the federal district courts in all matters as to which the Court of Claims had jurisdiction, where the amount involved did not exceed $10,000. U.S. Code, Title 28, § 41 (20).

By these provisions it is made plain that the Court of Claims, originally nothing more than an administrative or advisory body, was converted into a court, in fact as well as in name, and given jurisdiction over controversies which were susceptible of judicial cognizance. It is only in that view that the appellate jurisdiction of this court in respect of the judgments of that court could be sustained, or *concurrent* jurisdiction appropriately be conferred upon the federal district courts. The Court of Claims, therefore, undoubtedly, in entertaining and deciding these controversies, exercises judicial power, but the question still remains—and is the vital question—whether it is the judicial power defined by Art. III of the Constitution.

That judicial power apart from that article may be conferred by Congress upon legislative courts, as well as upon constitutional courts, is plainly apparent from the opinion of Chief Justice Marshall in *American Insurance Co.* v. *Canter*, 1 Pet. 511, 546, dealing with the territorial courts. " The jurisdiction," he said, " with which they are invested, is not a part of that judicial power which is defined in the 3d article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States." That is to say (1) that the courts of the territories (and, of course, other legislative courts) are invested with judicial power, but (2) that this power is not conferred by the third article of the Constitution, but by Congress in the execution of other provisions of that

instrument. The validity of this view is borne out by the fact that the appellate jurisdiction of this court over judgments and decrees of the legislative courts has been upheld and freely exercised under acts of Congress from a very early period, a practice which can be sustained, as already suggested, only upon the theory that the legislative courts possess and exercise judicial power—as distinguished from legislative, executive, or administrative power—although not conferred in virtue of the third article of the Constitution.

The authority to naturalize aliens has been vested in the courts from the beginning of the government; and it cannot be doubted that in discharging this function the courts exercise judicial power. But the courts of the states, with the acquiescence of all the departments of the federal government, have also exercised the same jurisdiction during this long period of time, and their authority to do so must be regarded as conclusively established. *Levin* v. *United States,* 128 Fed. 826, 828–831. In that case, Judge Sanborn, in a very carefully drawn opinion, pointed out that Congress cannot vest any portion of the judicial power granted by § 1 and defined by § 2 of the third article of the Constitution in courts not ordained and established by itself; * that the judicial power there granted and defined necessarily extended only to the trial of the classes of cases named in § 2; but that these sections neither expressly nor impliedly prohibited Congress from conferring judicial power upon other courts. " Thus," he says, " the authority granted

---

* The lack of authority in Congress to devolve any part of the judicial power defined by Art. III upon courts other than those created by itself must not be confused with its authority to vest jurisdiction in respect of some cases in courts whose judicial power is otherwise derived. Compare *Robertson* v. *Baldwin,* 165 U.S. 275, 278–280; *Claflin* v. *Houseman,* 93 U.S. 130, 136, *et seq.; Second Employers' Liability Cases,* 223 U.S. 1, 55, *et seq.*

to territorial courts to hear and determine controversies arising in the territories of the United States is judicial power. But it is not a part of that judicial power granted by section 1, and defined by section 2, of article 3 of the Constitution. Nevertheless, under the constitutional grant to Congress of power to "make all needful rules and regulations respecting the territory . . . belonging to the United States.' (article 4, § 3), that body may create territorial courts not contemplated or authorized by article 3 of the Constitution, and may confer upon them plenary judicial power, because the establishment of such courts and the bestowal of such authority constitute appropriate means by which to exercise the congressional power to make needful rules respecting the territory belonging to the United States . . . The grant by the Congress of the United States of the judicial power to admit aliens to citizenship, and to hear and decide the various questions which do not arise in the cases specified in article 3 of the Constitution, but which a proper exercise of the powers granted by that instrument to the executive or to the legislative department of the Government requires to be judicially decided, was neither expressly nor impliedly prohibited by that article. The congressional power to make such a grant, and to vest judicial authority in state courts and officers, in such cases, exists by virtue of the established rule that the grant of a power to accomplish an object is a grant of the authority to select and use the appropriate means to attain it."

If the power exercised by legislative courts is not *judicial* power, what is it? Certainly it is not legislative, or executive, or administrative power, or any imaginable combination thereof.

With the foregoing principles in mind we come, then, to a consideration of the crucial question here involved— Is the judicial power exercised by the Court of Claims

vested in virtue of the third article of the Constitution so as to bring its judges within the protection of that article as to tenure of office and compensation?

It must be conceded at the threshold that this court in several cases has expressed, more or less irrelevantly, its opinion in the affirmative. Thus, in *United States* v. *Klein,* 13 Wall. 128, 145, after reference to the legislation with respect to the Court of Claims, the view is expressed that such court was thus constituted one of those inferior courts which Congress authorizes. In *United States* v. *Union Pacific R. Co.,* 98 U.S. 569, 603, it was said that under the authority of Art. III Congress had created the district courts, the circuit courts, and the Court of Claims, and vested each of them with a defined portion of the judicial power found in the Constitution. In *Minnesota* v. *Hitchcock,* 185 U.S. 373, 386, the court, after directing attention to the fact that the United States could not be sued without its consent, said that with its consent it might be sued, in which event the judicial power of the United States extended to such a controversy, and added, " Indeed, the whole jurisdiction of the Court of Claims rests upon this proposition." See also *Kansas* v. *United States,* 204 U.S. 331, 342; *United States* v. *Louisiana,* 123 U.S. 32, 35.

None of these cases involved the question now under consideration, and the expressions referred to were clearly *obiter dicta,* which, as said by Chief Justice Marshall in *Cohens* v. *Virginia,* 6 Wheat. 264, 399, " may be respected but ought not to control the judgment in a subsequent suit when the very point is presented for decision."

On the other hand, this court, in *Ex parte Bakelite Corp.,* 279 U.S. 438, in a fully considered opinion holding that the Court of Customs Appeals was a legislative court, definitely took the opposite view. The status of the Court of Claims is there discussed at length, and the conclusion reached that it likewise is a legislative court. " It

was created, and has been maintained," we there said, "as a special tribunal to examine and determine claims for money against the United States. This is a function which belongs primarily to Congress as an incident of its power to pay the debts of the United States. But the function is one which Congress has a discretion either to exercise directly or to delegate to other agencies." The opinion then points out that the Court of Claims is, and always has been, as Congress declared at the outset, " a court for the investigation of claims against the United States "; that none of the matters made cognizable by the court inherently or necessarily requires judicial determination, but on the contrary " all are matters which are susceptible of legislative or executive determination and can have no other save under and in conformity with permissive legislation by Congress." It is noted as significant that the act constituting the court dispenses with trial by jury, a provision which was distinctly upheld in spite of the Seventh Amendment in *McElrath* v. *United States,* 102 U.S. 426. With respect to the status of the court, the opinion concludes (pp. 454–455):

" While what has been said of the creation and special function of the court definitely reflects its status as a legislative court, there is propriety in mentioning the fact that Congress always has treated it as having that status. From the outset Congress has required it to give merely advisory decisions on many matters. Under the act creating it all of its decisions were to be of that nature. Afterwards some were to have effect as binding judgments, but others were still to be merely advisory. This is true at the present time. A duty to give decisions which are advisory only, and so without force as judicial judgments, may be laid on a legislative court, but not on a constitutional court established under Article III.

" In *Gordon* v. *United States,* 117 U.S. 697, and again in *In re Sanborn,* 148 U.S. 222, this Court plainly was of

opinion that the Court of Claims is a legislative court specially created to consider claims for money against the United States, and on that basis distinctly recognized that Congress may require it to give advisory decisions. And in *United States* v. *Klein,* 13 Wall. 128, 144–145, this Court described it as having all the functions of a court, but being, as respects its organization and existence, undoubtedly and completely under the control of Congress.

"In the present case the court below regarded the recent decision in *Miles* v. *Graham,* 268 U.S. 501, as disapproving what was said in the cases just cited, and holding that the Court of Claims is a constitutional rather than a legislative court. But in this *Miles* v. *Graham* was taken too broadly. The opinion therein contains no mention of the cases supposed to have been disapproved; nor does it show that this Court's attention was drawn to the question whether that court is a statutory court or a constitutional court. In fact, as appears from the briefs, that question was not mooted. Such as were mooted were considered and determined in the opinion. Certainly the decision is not to be taken in this case as disturbing the earlier rulings or attributing to the Court of Claims a changed status. *Webster* v. *Fall,* 266 U.S. 507, 511.

"That court was said to be a constitutional court in *United States* v. *Union Pacific R.R. Co.,* 98 U.S. 569, 602–603; but this statement was purely an *obiter dictum,* because the question whether the Court of Claims is a constitutional court or a legislative court was in no way involved. And any weight the dictum, as such, might have is more than overcome by what has been said on the question in other cases where there was need for considering it."

It is true that the foregoing views expressed in the *Bakelite* case were likewise not strictly necessary to the

decision; but unlike previous and contrary expressions of opinion on the same subject, they are elucidated and fortified by reasoning and illustration, and, moreover, are the result of a careful review of the entire matter. It is also true that in the *O'Donoghue* case, *supra,* we have rejected the *dictum* in the *Bakelite* case as to the status of the Supreme Court and Court of Appeals of the District of Columbia, but a reference to the discussion in the *O'Donoghue* case will make apparent the difference in force between the *dictum* there involved and the one here involved. In addition to this, whatever may be said in respect of the *obiter* character of the opinion as to the Court of Claims, the status of the Court of Customs Appeals, as a purely legislative court, was definitely adjudged. And neither by brief nor in argument here is any serious attempt made to differentiate, in respect of the question now being considered, between the Court of Claims and the Court of Customs Appeals; and we have been unable to discover any ground for such a differentiation.

Further reflection tends only to confirm the views expressed in the *Bakelite* opinion as to the status of the Court of Customs Appeals, and we feel bound to reaffirm and apply them. And, giving these views due effect here, we see no escape from the conclusion that if the Court of Customs Appeals is a legislative court, so also is the Court of Claims. We might well rest the present case upon that determination; but must not do so without considering another view of the question, which seems to find support in some expressions of this court, namely, that when the United States consents to be sued, the judicial power of Art. III at once attaches to the court upon which jurisdiction is conferred in virtue of the clause which in comprehensive terms extends the judicial power to " controversies to which the United States shall be a party."

In *Minnesota* v. *Hitchcock, supra,* at pp. 384, 386, it was said:

" This is a controversy to which the United States may be regarded as a party. It is one, therefore, to which the judicial power of the United States extends. It is, of course, under that clause a matter of indifference whether the United States is a party plaintiff or defendant. It could not fairly be adjudged that the judicial power of the United States extends to those cases in which the United States is a party plaintiff and does not extend to those cases in which it is a party defendant.

" While the United States as a government may not be sued without its consent, yet with its consent it may be sued, and the judicial power of the United States extends to such a controversy."

See also *Kansas* v. *United States, supra,* at p. 342.

This conception of the application of the judicial article of the Constitution, which at first glance seems plausible, will be found upon examination and consideration to be entirely fallacious.

We first direct attention to the carefully chosen words of § 2, cl. 1, Art. III. By that clause the judicial power is extended to *all* cases in law and equity arising under the Constitution, etc.; to *all* cases affecting ambassadors, other public ministers and consuls; and to *all* cases of admiralty and maritime jurisdiction. Then the comprehensive word " all " is dropped, and the enumeration continues in terms to apply to controversies (but not to " all ") to which the United States shall be a party; to controversies between two or more states, etc. The use of the word " all " in some cases, and its omission in others, cannot be regarded as accidental, under the rule stated in an early case, *Holmes* v. *Jennison,* 14 Pet. 540, 570–571, and ever since fully accepted, that—" In expounding the

Constitution of the United States, every word must have
its due force, and appropriate meaning; for it is evident
from the whole instrument, that no word was unneces-
sarily used, or needlessly added. The many discussions
which have taken place upon the construction of the Con-
stitution, have proved the correctness of this proposition;
and shown the high talent, the caution, and the foresight
of the illustrious men who framed it. Every word appears
to have been weighed with the utmost deliberation, and
its force and effect to have been fully understood." See
also *Myers* v. *United States*, 272 U.S. 52, 151.

The significance of the use of the word " all " in some
instances and its omission in others is commented upon by
Mr. Justice Story in *Martin* v. *Hunter's Lessee*, 1 Wheat.
304, 333–336; and it is there suggested that the word
" all," which is used in the earlier part of § 2 of the judicial
article, was dropped in the latter *ex industria*, and that
from this difference of phraseology, perhaps, a difference
of constitutional intention may with propriety be inferred.
See also 2 Story on the Constitution, (4th ed.), p. 458,
§ 1674 *et seq.*

We are here immediately concerned only with that pro-
vision of Article III which extends the judicial power to
" controversies to which the United States shall be a
party." Literally, this includes such controversies,
whether the United States be party plaintiff or defendant;
but in the light of the rule, then well settled and under-
stood, that the sovereign power is immune from suit, the
conclusion is inadmissible that the framers of the Consti-
tution intended to include suits or actions brought against
the United States. And here the omission to qualify
" controversies " by the word " all," as in some other
instances, becomes peculiarly suggestive.

The Judiciary Act of 1789 has always been regarded as
practically contemporaneous with the Constitution, and as

such, of great value in expounding the meaning of the judicial article of that instrument. *Martin* v. *Hunter's Lessee, supra,* at pp. 351–352; *Cohens* v. *Virginia, supra,* at p. 420; *Börs* v. *Preston,* 111 U.S. 252, 256–257; *Wisconsin* v. *Pelican Ins. Co.,* 127 U.S. 265, 297. Section 11 of that act, c. 20, 1 Stat. 73, 78, confers jurisdiction on the circuit courts, under specified conditions, of suits " where . . . the United States are plaintiffs, or petitioners; . . ." And in *Cohens* v. *Virginia, supra,* at pp. 411–412, Chief Justice Marshall said, " The universally received opinion is, that no suit can be commenced or prosecuted against the United States; that the judiciary act does not authorize such suits."

The judicial clause also extends the judicial power (again omitting the word " all ") to controversies " between a State and citizens of another State." The question as to whether this authorized a suit *against* a state by a citizen of another state was considered in *Chisholm* v. *Georgia,* 2 Dall. 419. Opinions were delivered *seriatim,* four justices, then constituting a majority, agreeing that such a suit could be maintained. Justice Iredell dissented in a vigorous opinion. He pointed out that prior to the adoption of the Constitution a sovereign state, without its consent, was not amenable to suit at the hands of an individual, and concluded that this rule had not been abrogated by the constitutional provision, in spite of the generality of its language. The immediate response to this decision was the submission and adoption of the Eleventh Amendment, which provides:

" The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State."

In terms this amendment includes only citizens or subjects of another or of a foreign state, not citizens of the

state called to account. And in December, 1884, a suit was brought in a federal circuit court against the State of Louisiana by a citizen of that state to recover the amount of certain unpaid coupons annexed to an issue of state bonds. *Hans* v. *Louisiana,* 24 Fed. 55. The circuit court dismissed the suit upon the ground that the state could not be sued without its consent. The case then came to this court on error, and the judgment was affirmed. *Hans* v. *Louisiana,* 134 U.S. 1. The precise question considered and determined was—Does the judicial power of the United States extend to a case arising under the Constitution or laws thereof, brought against a state by one of its own citizens? Mr. Justice Bradley delivered the opinion of the court. Plaintiff in error contended that, being a citizen of Louisiana, the Eleventh Amendment presented no obstacle to his suit, since that amendment prohibits suits against a state only when brought by citizens of another state, or by citizens or subjects of a foreign state. This court, conceding that the amendment so reads, said that if there were no other reason or ground for abating the suit it might be maintainable, with the anomalous result that a state might be sued in the federal courts by its own citizens, though it could not be sued for a like cause of action by citizens or subjects of another or foreign state. But, it said, such a result would be no less startling and unexpected than was the decision in *Chisholm* v. *Georgia,* which in effect had been overruled by the Eleventh Amendment; and the dissenting opinion of Mr. Justice Iredell, which was characterized as able, was distinctly approved. As opposed to the decision in *Chisholm* v. *Georgia,* attention also was called to the utterances of Hamilton and others, pending the adoption of the Constitution, to the precise contrary. Hamilton repudiated the suggestion that the citizens of one State would be enabled, under the original draft of

the Constitution, to prosecute suits against another state in the federal courts. He said (p. 13):

" It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent*. This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States and the danger intimated must be merely ideal. . . . The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretension to a compulsive force. They confer no right of action independent of the sovereign will."

The words of Madison and of Marshall in the Virginia Convention were quoted, the former to the effect that the only operation which the provision of the judicial clause then under discussion could have was that " if a State should wish to bring a suit against a citizen [of another state], it must be brought before the federal court "; and those of Marshall: " I hope that no gentleman will think that a State will be called at the bar of the federal court. . . . It is not rational to suppose that the sovereign power should be dragged before a court. The intent is to enable States to recover claims of individuals residing in other States . . . I see a difficulty in making a State defendant which does not prevent its being plaintiff." This court then declared (p. 14) that " looking at the subject as Hamilton did, and as Mr. Justice Iredell did, in the light of history and experience and the established order of things, the views of the latter were clearly right "; and that the views expressed by them applied as well to the then pending case as to that of *Chisholm v. Georgia.* Refusing to adhere to the mere letter of the Eleventh Amendment, the court said that to do so would be to strain

the Constitution to a construction never imagined or dreamed of, and then added, " The truth is, that the cognizance of suits and actions unknown to the law, and forbidden by the law, [that is to say, as applied to the present case, of suits *against* the United States] was not contemplated by the Constitution when establishing the judicial power of the United States."

This language applies with equal force to suits against a state and those brought against the United States. The doctrine of sovereign immunity is fully discussed in *Hans* v. *Louisiana,* and in the dissenting opinion of Mr. Justice Iredell in *Chisholm* v. *Georgia.* We need not repeat that discussion here. Mr. Justice Holmes, speaking for the court in *Kawananakoa* v. *Polyblank,* 205 U.S. 349, 353, tersely said, "A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." It is enough to say that in the light of the settled and unvarying rule upon that subject it is not reasonably possible to assume that it was within the contemplation of the framers of the Constitution that the words, " controversies to which the United States shall be a party," should include controversies to which the United States shall be a party *defendant.* That clause must be construed, in accordance with the practical construction put upon it by the first Judiciary Act, as though it read, " controversies to which the United States shall be a party plaintiff or petitioner "; and, thus read, controversies to which the United States may by statute be made a party defendant, at least as a general rule, lie wholly outside the scope of the judicial power vested by Art. III in the constitutional courts. See *United States* v. *Texas,* 143 U.S. 621, 645–646.

The view, therefore, that when congressional consent has been given to the maintenance of suits against the

United States, it *ipso facto* becomes a matter of indifference whether the United States is a party plaintiff or defendant, because the judicial power as defined in Art. III immediately and automatically extends to such suits, must be rejected. It cannot be reconciled with the settled principle that where a controversy is of such a character as to require the exercise of the judicial power *defined by Art. III,* jurisdiction thereof can be conferred only on courts established in virtue of that article, and that Congress is without power to vest *that* judicial power in any other judicial tribunal, or, of course, in an executive officer, or administrative or executive board, since, to repeat the language of Chief Justice Marshall in *American Insurance Co.* v. *Canter, supra,* " they are incapable of receiving it."

The rule is stated in *Ex parte Randolph,* 2 Brock. 447, 20 Fed. Cas. (No. 11,558) 242, 254, by Chief Justice Marshall, sitting on the circuit. That case involved the legality of an arrest by virtue of a distress warrant issued from the Treasury Department, under an act of Congress which provided for the issuing of such a warrant by the agent of the Treasury against all military and naval officers, etc., charged with the disbursement of the public moneys, who should fail to pay and settle their accounts with the Treasury Department. Under the act the Treasury Department had settled the account and ascertained the sum due to the government. The act was attacked as unconstitutional on the ground that it violated the first section of the third article of the Constitution. As preliminary to the determination of the question, Chief Justice Marshall said:

" If this ascertainment of the sum due to the government, and this issuing of process to levy the sum so ascertained to be due, be the exercise of any part of the judicial power of the United States, the law which directs it, is plainly a violation of the first section of the third article of the constitution, which declares, that ' the judicial power

of the United States shall be vested in one supreme court, and in such inferior courts as congress shall from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behaviour.'. The judicial power extends to ' controversies to which the United States shall be a party.' The persons who are directed by the act of Congress to ascertain the debt due from a delinquent receiver of public money, and to issue process to compel the payment of that debt, do not compose a court ordained and established by congress, nor do they hold offices during good behaviour. Their-offices are held at the pleasure of the President of the United States. They are, consequently, incapable of exercising any portion of the judicial power, and the act which attempts to confer it, is absolutely void."

In *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 284, it was declared to be beyond the power of Congress either to " withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty "; or, on the other hand, to " bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." See also *United States* v. *Duell,* 172 U.S. 576, 582, 589.

Since all matters made cognizable by the Court of Claims are equally susceptible of legislative or executive determination, *Bakelite* case, *supra,* pp. 452, 458, they are, of course, matters in respect of which there is no constitutional right to a judicial remedy, *United States* v. *Babcock,* 250 U.S. 328, 331; and the authority to inquire

into and decide them may constitutionally be conferred on a nonjudicial officer or body. In *United States* v. *Ferreira,* 13 How. 40, 48, this court, referring to an act of Congress (passed in pursuance of a treaty), directing that judges of the territorial courts of Florida should examine and adjudge certain claims against the United States for losses suffered as the result of military operations, with power of review reserved to the Secretary of, the Treasury, held that the power conferred, although judicial in nature, was nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims. under a treaty. "A power of this description," it was said, "may constitutionally be conferred on a Secretary as well as on a commissioner. But [it] is not judicial in either case, in the sense in which judicial power is granted by the Constitution to the courts of the United States."

The view under discussion—that Congress having consented that the United States may be sued, the judicial power defined in Art. III at once attaches to the court authorized to hear and determine the suits—must, then, be rejected, for the further reason, or, perhaps, what comes to the same reason differently stated, that it cannot be reconciled with the limitation fundamentally implicit in the constitutional separation of the powers, namely, that a power definitely assigned by the *Constitution* to one department can neither be surrendered nor delegated by that department, nor vested by *statute* in another department or agency. Compare *Springer* v. *Philippine Islands,* 277 U.S. 189, 201–202. And since Congress, whenever it thinks proper, undoubtedly may, without infringing the Constitution, confer upon an executive officer or administrative board, or an existing or specially constituted court, or retain for itself, the power to hear and determine controversies respecting claims against the United States, it follows indubitably that such power, in whatever guise or by whatever agency exercised, is no

part of the judicial power vested in the constitutional courts by the third article. That is to say, a power which may be devolved, at the will of Congress, upon any of the three departments plainly is not within the doctrine of the separation and independent exercise of governmental powers contemplated by the tripartite distribution of such powers. Compare *Kilbourn* v. *Thompson,* 103 U.S. 168, 190–191.

We find nothing which militates against the foregoing views in the requirement that the Court of Claims, in cases properly brought before it in respect of property expropriated in the exercise of the power of eminent domain, must award just compensation under the Fifth Amendment, or in the provision of the Tucker Act (U.S. Code, Title 28, § 252) requiring the court in cases brought against the government also to consider and decide set-offs and other claims made by the government against the petitioner and award judgment accordingly. In the former case the requirement is one imposed by the Constitution and equally applicable whether jurisdiction be exercised by a legislative court or a constitutional court; and the latter is simply a provision which the claimant must accept as a condition upon which he may avail himself of the privilege of suing the government in the special court organized for that purpose. *McElrath* v. *United States, supra* at p. 440.

From whatever point of view the question be regarded, the conclusion is inevitable that the Court of Claims receives no authority and its judges no rights from the judicial article of the Constitution, but that the court derives its being and its powers and the judges their rights from the acts of Congress passed in pursuance of other and distinct constitutional provisions. The questions propounded will be answered accordingly.

*Question No. 1, No.*
*Question No. 2, No.*
*Question No. 3, Yes.*