UNITED STATES of America,
Plaintiff,

v.

**COUNTY BOARD OF ELECTIONS OF MONROE COUNTY, NEW YORK, Robert W. Northrop and Kenneth T. Power, Commissioners of Election, Monroe County, New York, Defendants.**

Civ. No. 11590.

United States District Court
W. D. New York.

Dec. 8, 1965.

Before KAUFMAN, Circuit Judge, and BURKE and HENDERSON, District Judges.

KAUFMAN, Circuit Judge.

■ Born out of civil rights problems currently plaguing the south and the violence flowing from them, the Voting Rights Act of 1965 (Public Law 89–110; 79 Stat. 437, 444) represented a re-commitment by this country to the fundamental principles upon which it was founded. But, despite the principle motivation for its passage, this Act, as our discussion shall indicate, was not designed to remedy deprivations of the franchise in only one section of the country. Rather, it was devised to eliminate second-class citizenship wherever present.

■ We are here confronted with a challenge to the constitutional power of Congress to enact one segment of that Act: Section 4(e).[1] Section 4(e) (2) provides, in part, that those who have completed the sixth primary grade in a public school in the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall not be denied the right to vote because of their inability to read, write or interpret any matter in English. On the government's application for a temporary restraining order,[2] Chief Judge Burke of the United States District Court for the Western District of New York ordered the Board of Elections of Monroe County to register all persons who, by virtue of Section 4(e), could qualify as voters. Subsequently, this

John Doar, Asst. Atty. Gen. of United States, John T. Curtin, U. S. Atty. for Western District of New York, St. John Barrett, Louis Kauder, and Louis Lucas, Attorneys, Department of Justice, for plaintiff.

William J. Stevens, Rochester, N. Y., for defendants.

Louis J. Lefkowitz, Atty. Gen. of New York, intervenor; Ruth Kessler Toch, Asst. Sol. Gen. of New York, Jean M. Coon, Asst. Atty. Gen. of New York, for the State as amicus curiae.

1. Section 4(e) of the Voting Rights Act provides, in part, that:
"(1) Congress hereby declares that to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language.
"(2) No person who demonstrates that he has successfully completed the sixth

primary grade in a public school in * * * the Commonwealth of Puerto Rico in which the predominant classroom language was other than English, shall be denied the right to vote in any Federal, State, or local election because of his inability to read, write, understand, or interpret any matter in the English language * * *."

2. The government instituted the instant action for injunctive relief pursuant to Section 12(d) of the Voting Rights Act of 1965.

three-judge District Court[3] heard argument, and upon agreement of the parties as to the facts and their consent to a final determination on the merits without a full trial, we agreed to render our judgment. We find that Section 4(e) of the Voting Rights Act of 1965 is a valid exercise of the powers granted to Congress by the federal Constitution and therefore grant the government's motion for a permanent injunction.

The factual basis of this challenge to the validity of Section 4(e) is undisputed. On September 30, 1965, Maria Lopez, a citizen of the United States and resident of the State of New York, approached election inspectors in a Rochester polling booth near her home and attempted to register to vote in the forthcoming statewide general election. Miss Lopez, who had just turned twenty-one, established that she had successfully completed the ninth grade in American-flag public schools in the Commonwealth of Puerto Rico. Since Spanish had been the predominant classroom language in those schools, Miss Lopez could neither read nor write the English language to the satisfaction of the election officials. Despite the clear mandate of Section 4 (e), which expressly provides that a person having an education equivalent to that which Miss Lopez obtained in Puerto Rico may not be "denied the right to vote" in any election, she was refused registration.

Miss Lopez protested this infraction of a right which, she believed, had been secured by the recent enactment of the Voting Rights Act. Upon being interviewed by Agents of the Federal Bureau of Investigation the individual Commissioners of Election, who are named as defendants, stated that despite Section 4(e) of the Voting Rights Act, it was the *policy* of the Board of Elections of Monroe County to refuse to register *any* citizen who had completed the sixth grade in American-flag public schools in which the predominant classroom language was Spanish, unless as provided by the New York Constitution[4] and the applicable New York Election Law[5] the citizen seeking to vote also could pass an English language reading and writing test. These defendants, fully conscious that their stand placed them in jeopardy of violating the Federal Voting Rights Act, expressed their wish to have the clear conflict between federal and state law resolved.

I.

Article IV, Section 3 of the United States Constitution empowers Congress to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Congressional legislation relating to Puerto Rico and its inhabitants is based on the power vested in Congress by this Article of the Constitution as well as the provisions of the Treaty of Paris of 1899 in which Spain ceded possession of this island to the United States.[6] Thus, pursuant to Article IV, Section 3, Congress has been authorized to determine the mode of government of the island, as it first did with the passage of the Foraker Act of 1900 and as it continued to do until its policy of government autonomy for Puerto Rico became effective in 1952. Similarly, this Article of the Constitution empowered Congress to make the inhabitants of

---

3. See 28 U.S.C. §§ 2281, 2284. See also note 15, infra.

4. The New York Constitution, Art, II, § 1, provides, in part, that:
   " * * * no person shall become entitled to vote * * * unless such person is * * * able * * * to read and write English."

5. Section 150 of the New York Election Law, McKinney's Consol.Laws, c. 17, provides, in part, that:

" * * * In the case of a person who became entitled to vote in this state * * * such person must * * * be able * * * to read and write English."

6. The treaty provides that "[t]he civil rights and political status of the native inhabitants of [Puerto Rico] shall be determined by the Congress." 30 Stat. 1754, at 1759.

Puerto Rico citizens of the United States, a power not questioned here, and also to establish a system of public schools needed to educate Puerto Ricans in their responsibilities as citizens of this country. (See Foraker Act, 31 Stat. 77, and Jones Act, 39 Stat. 951.) Indeed, by means of this all-pervasive Article IV power, Congress controlled the very structure and existence of Puerto Rican life and, for over half-century, effectively shaped its institutions in accordance with Congress' own territorial policies. But, throughout most of this period, Congress, cognizant of evolving principles of international law, recognized the inherent right of a people and the wisdom of a foreign policy which sought to preserve the territory's culture and the integrity of its mother tongue.

For almost 50 years Congressional policy relating to public education in Puerto Rico was expressed by successive Commissioners of Education appointed by the President of the United States.[7] While, in the earliest years of the territorial administration the Commissioners decided that the English language would be the medium of instruction in these schools, it was soon apparent that the attempt to "Americanize" the inhabitants of the newly acquired territory by the artificial introduction of a foreign language into its educational processes was not only impracticable, but disadvantageous to this country's relations with other Latin American nations. Consequently, in 1916, after a government sponsored study concluded that it was unwise to "attempt to teach English to * * * Puerto Rican children as if it were their mother tongue, without regard to the fact that they live in a non-English environment", and to lose the advantages which accrued to the children

from linguistic training in their native language,[8] the Commissioner of Education directed that Spanish would henceforth be the medium of instruction in grades 1–4, and that English would be used as the classroom language in the higher grades. After 18 years of less than satisfactory experience with this practice, the Commissioner of Education decided upon another revision and provided that henceforth Spanish would be used as a medium of instruction in the first through eighth grades. Finally, in 1947, a new Commissioner of Education appointed by the first popularly elected Governor of Puerto Rico established Spanish as the medium of instruction in *all* grades, with English to be taught as a language course in the curriculum. Thus, children educated in public schools of Puerto Rico since 1930 have been taught in Spanish from the first through the eighth grades, and the generation of Puerto Rican students now attaining the age of 21 has been taught in Spanish in all grades.

This educational policy, deliberately determined by the United States, is at the core of the problem that gives rise to the instant action. Specifically, we are confronted with American citizens of Puerto Rican birth or residence who have been encouraged by our government's Puerto Rican educational and foreign policy to use Spanish as the means of communication in both public and private life. Moreover, since the Jones Act of 1917, American citizens of Puerto Rican birth have been permitted free and unrestricted migration to the mainland of the United States. As a result, they are enabled to become residents of any state, "there to enjoy every right of any other citizen of the United States, civil, social and political." Balzac v. People of Porto Rico, 258 U.S. 298, 308, 42 S.Ct. 343, 347,

---

7. Just prior to its repeal in 1952, the applicable provision (48 U.S.C. § 783) read as follows:

"The commissioner of education shall superintend public instruction throughout Puerto Rico * * * and all courses of study shall be prepared by

him, subject to disapproval by the governor * * *."

8. Gov't. of Puerto Rico, The Problem of Teaching English to the People of Puerto Rico, Bulletin No. 1916, pp. 25–26 (San Juan, 1916) (as quoted on p. 20, brief for U.S.).

66 L.Ed. 627 (1922). This policy, and peculiarly mid-twentieth century influences, gave rise to a phenomenon theretofore unknown in the history of American immigration. During the decade from 1951 through 1960, when Puerto Rican migration to continental United States was at its height there developed a considerable circular movement of people between New York City, the heart of the mainland Puerto Rican population, and San Juan, Puerto Rico. The reason for this unusual movement of immigrants back and forth between the "mother land" and their new home stemmed from the fact that:

"The links between the New York Puerto Ricans and the island Puerto Ricans are close and complex, and quite different from the relationship of earlier migrant groups to their homeland. Puerto Rico is part of the United States, and there is no control over movement between the island and the mainland. Puerto Rico is relatively close by air, and air passage is not too expensive. The island government takes a strong interest in its people. * * [Thus,] going is not, as it was in earlier migrations, either the return of someone who is defeated and incapable of adjustment, or of someone who has made a small competence that will look big in the homeland * * * although there is more and more of this movement. Going back is too easy for it to have such great significance." [9]

One obvious consequence of this movement has been to strengthen the hold of Spanish as the native tongue of the Puerto Rican-American citizen, a tendency reinforced by the fact that the government of the City of New York has encouraged its employees to learn Spanish and has issued many pronouncements to the general public in both the Spanish and English languages. At least one important commentator has stated the significant truth, easily verified by any New York City resident, that " * * * Spanish already has a much stronger official position in New York than either Italian or Yiddish ever had", with the result that "people active in politics and the leaders of the Puerto Rican community expect that Spanish will be the major language [after English] in use in the community for as long ahead as any one can see." [10]

The Congressional policies of encouraging the use of Spanish as the native tongue of Puerto Rican-Americans and unrestricted travel between mainland United States and Puerto Rico, have caused a very substantial Spanish-speaking population (numbering more than one-half million people) to become residents of New York State. It is this body of American citizens, whose plight results from American policy, who, in an attempt to integrate their community into the main stream of American life and to improve their economic and social position by making their presence felt in government councils, are faced with the requirement imposed by the State of New York that one must read and write the English language in order to register to vote. In this regard it must be carefully noted that the applicable state laws do not merely require that a person be "literate," but literate in the English language, a literacy requirement which, in this context, no doubt excludes many accomplished students of the Puerto Rican public school system.

There is little doubt that Section 4(e) was enacted out of concern for the Puerto Rican-American's problem in integrating his community into the political lifestream of the nation, and, in particular, the political life of New York State. Senators Javits and Kennedy, representing the state which has become host to more Spanish speaking Puerto Rican-Americans than all of the other 49 states combined, proposed Section 4(e) precisely because, the Puerto Rican-American's

9. Glazer & Moynihan, Beyond the Melting Pot (M.I.T. and Harv. Univ. Press 1963) pp. 99–100.

10. Id., at 101.

plight, insofar as this State's voting laws are concerned is not of his self-doing and is not easily overcome. Senator Kennedy, commenting on the Puerto Rican citizen, stated: "That his schooling takes place in Spanish is not up to him, but is due to the fact that the U. S. Government has chosen to encourage the cultural autonomy of the Commonwealth of Puerto Rico, to make Puerto Rico a showcase for all of Latin America," (111 Cong.Rec. 10675 (Daily Ed.)). Similarly, Representative Gilbert of New York, one of the sponsors of the same measure in the House of Representatives pointed out that it was "an anomaly for [Congress] to encourage the perpetuation of Puerto Rico's Spanish language culture and at the same time do nothing to protect the rights of citizenship of Puerto Ricans who move to other sections of the country." (111 Cong.Rec. 15666 (Daily Ed.)). The adoption of the Javits-Kennedy amendment to the bill and the enactment of Section 4(e) into the law of the land after the purpose to be accomplished by the legislation was clearly stated, evinced a congressional sentiment fully in accord with these views.

The defendants contend, however, that despite the sui generis circumstances which resulted from Congress' actions over almost a half century, that body lacked the *power* to correct the anomaly it had spawned by its Puerto Rican policies. We believe that Congress acted well within its constitutional limits when it legislated to prevent New York from prohibiting or, at the very least, substantially impeding the integration of Puerto Rican emigrants into its political life through the imposition of an English language requirement for voter registration.

■ The defendants, and the State, as amicus curiae, have urged further that

Congress has no such restricting power because of the established maxim that the prescription for qualifications of voters in state or federal elections is reserved exclusively for the state's province. Conceding the general reservation of this power to the states under Article I, Section 4 and the Tenth Amendment to the Constitution, however, does not diminish Congress' authority to provide access to the polls for American citizens of Puerto Rican background which would otherwise be denied to them primarily because of Congress' long history of supervision over the affairs of Puerto Ricans.

### II.

Because of these long-standing foreign and other policies, as we have shown, respecting the education of Puerto Rican citizens in Spanish, Congress pursuant to the Fourteenth Amendment [11] was empowered to correct what it reasonably believed to be an arbitrary state-created distinction.[12] Discussing Congressional power under the Fourteenth Amendment, the Supreme Court stated in Ex Parte State of Virginia, 100 U.S. 339, 345–346, 25 L.Ed. 676 (1879):

"\* \* \* It is not said the *judicial power* of the general government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the government shall be authorized to declare void any action of a state in violation of the prohibitions. It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective." (Emphasis the Court's.)

We recognize that courts in the past have sustained against Fourteenth

---

11. Section 5 of the Fourteenth Amendment pursuant to which Congress enacted Section 4(e) expressly provides that "[t]he Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

12. We are fortified in this view by the presumption of constitutionality accorded to every act of Congress.

Amendment challenges, literacy tests as a prerequisite of the right to vote. In Lassiter v. Northhampton Election Board, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), the North Carolina statute was upheld, but the English-language aspect of the law was not before the Court since no claim was made that the plaintiff was literate in a foreign language. See also Camacho v. Doe, 31 Misc.2d 692, 221 N.Y.S.2d 262, affirmed 7 N.Y.2d 762, 194 N.Y.S.2d 33, 163 N.E.2d 140 (1959); Camacho v. Rogers, 199 F.Supp. 155 (S.D.N.Y.1961). More significantly, in none of these cases were the courts confronted with a specific Act of Congress inferentially expressing a determination by Congress that the state statute was unfair and arbitrary because it conflicted with and impinged upon the exercise by that body of its territorial and treaty powers. We believe, therefore, that these decisions do not control the case at bar.

■ New York urges that Congress' power under the Fourteenth Amendment is limited to areas in which the judiciary has already found a violation of the Equal Protection, Due Process or Privileges and Immunities Clauses. But such a view interprets Congressional power under the Fourteenth Amendment too narrowly. Section 5 of the Fourteenth Amendment, which gives Congress the power of enforcement, would be superfluous if Congress' role was merely to passively await the determination by a court that there is a need for legislation to protect Fourteenth Amendment rights.

■ Inherent in its power to enforce the Fourteenth Amendment, Congress must be considered as having some latitude to determine for itself what patterns of activity contravene Fourteenth Amendment rights. Whether any particular form of state action is prohibited by the Amendment depends upon an assessment of many factors, cf. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961);

including the importance to the person aggrieved of the activity in which he seeks to engage. See e. g., Skinner v. State of Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Reynolds v. Sims, 377 U.S. 533, 562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). At the very least, in a case such as presented to us, where Congress has adopted and fostered policies which would be frustrated by conflicting state action, Congress has responsibility for exercising judgment as to when the Fourteenth Amendment is violated and the power, in appropriate cases, to eliminate the violation.

Moreover, Congress has been known to declare by legislation its disagreement with a Supreme Court constitutional interpretation. The Congressional determination, in one fairly recent instance, has been respected by the Court when the subject matter involved was particularly suited to Congressional judgment. Thus, in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), the Supreme Court reversed its earlier holdings in Ex parte Bakelite Corp., 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929), and Williams v. United States, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933), that the United States Court of Customs and Patent Appeals and the United States Court of Claims were not "constitutional" courts created pursuant to Article III, when Congress subsequently provided that "Such court is hereby declared to be a court established under article III * * *." [13] The Congressional pronouncement was given special weight by the Court because Congress had based its determination upon historial reference, and the general area was one peculiarly within Congressional cognizance. The Supreme Court noted that when it previously had considered the question, it "did not have the benefit of this congressional understanding. * * *" 370 U.S. at 542, 82 S.Ct. at 1468.

We cannot say, therefore, that in view of the extensive backdrop to this legisla-

13. Act of July 28, 1953, § 1, 67 Stat. 226; Act of August 25, 1958, § 1, 72 Stat. 848.

tion, Congress made a determination on a matter in which it lacked special competence and experience when it enacted Section 4(e). The judgment of Congress here, was one which it was superbly suited to make. We conclude, therefore, that because of the sui generis circumstances present in the instant case, Congress could correct, under its general Fourteenth Amendment powers that which tended to dilute and frustrate a course and policy it had deliberately followed for so long, in upgrading the people of the Island of Puerto Rico to full and complete American citizenship.

In so ruling, we are not unmindful that a three-judge District Court for the District of Columbia has decided the question before us to the contrary. But, we are unaware of any precedental authority for its holding that the power of Congress to legislate for a territory does not embrace authority, under the Fourteenth Amendment, to confer "additional rights on citizens of the territory when they migrate to other parts of the United States." Morgan v. Katzenbach, D.C., 247 F.Supp. 196. (November 15, 1965). Rather, we are persuaded by the logic of Circuit Judge McGowan's dissenting opinion, setting forth the fundamental concept that to the extent this Congressional exercise of power "may perhaps operate to place citizens of differing national origins in differing positions vis-a-vis the right to vote, the answer is that citizens within the reach of the constitutional grant of power over the territories are inescapably and legitimately separated by that fact from citizens to whom it has never extended." [14]

### III.

Section 4(e) of the Voting Rights Act of 1965, being a law of the United States enacted pursuant to the Constitution, is the "Supreme Law of the Land," U.S.Const., Art. VI, and to the extent that the New York Constitution and Election Law prevent Miss Lopez and other American citizens educated in Spanish-language Puerto Rican schools from registering to vote in violation of the provisions of Section 4(e), the state constitution and law are invalid and the enforcement thereof must be enjoined. The above incorporates the findings of fact and conclusions of law of this three-judge court.[15]

BURKE, Chief Judge (concurring).

This is to certify that I have individually arrived at the same conclusion that we have reached collectively.

14. We believe also, as did Judge McGowan, that Article IV, Section 3 of the Constitution provides an alternative ground for upholding Congress' power to enact Section 4(e). Morgan v. Katzenbach, supra (dissenting opinion).

15. This three-judge court was convened pursuant to 28 U.S.C. § 2281 on October 13, 1965, five weeks before the Supreme Court's recent decision in Swift & Company, Inc. v. Wickham, 86 S.Ct. 258 (1965) (October Term). In this decision, the Court overruled Kesler v. Department of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962) and held that § 2281 authorizes the impaneling of a three-judge court only in "injunction suits depending directly upon a substantive provision of the Constitution, leaving cases of conflict with a federal statute * * * to follow their normal course in a single-judge court." 86 S.Ct. at 267.

Since the Court did not deal with the effect of its decision on three-judge courts already assembled and in the process of rendering decision, we have taken the precaution of certifying that the original district judge, also a member of this three-judge panel, individually arrived at the result in the instant case, and has adopted and subscribed to the opinion and conclusions of this three-judge court. See Swift & Company, Inc. v. Wickham, D.C., 230 F.Supp. 398, 410 (1964).